**In the Matter of the ESTATE OF Henry R. WEBER, Decedent.**

**No. C4–87–1451.**

Court of Appeals of Minnesota.

Jan. 19, 1988.

Review Denied April 4, 1988.

**498** 

George E. Antrim, III, Antrim & Associates, P.A., Minneapolis, for appellants the Weber Family.

Joseph A. Nilan, Lang, Pauly & Gregerson, Ltd., Minneapolis, for William R. Rutstein, Trustee.

Robert L. Smith, Minneapolis, guardian ad litem.

Charles W. Quaintance, Jr., David F. Herr, Justin H. Perl, Maslon Edelman Borman & Brand, Minneapolis, for respondents Oppenheimer Wolff & Donnelly and Lehan J. Ryan.

Raymond L. Erickson, J. Kent Richards, Hanft, Fride, O'Brien, Harries, Swelbar & Burns, P.A., Duluth, for respondent Robert O. Rosenberg.

Eric J. Magnuson, Lewis A. Remele, Jr., Rider, Bennett, Egan & Arundel, Minneapolis, for respondent First Nat. Bank of Minneapolis.

Heard, considered and decided by HUSPENI, P.J., and RANDALL and STONE,* JJ.

## OPINION

HUSPENI, Judge.

This is an appeal from the probate court's denial of appellants' motion for vacation of an order discharging personal representatives and an order allowing a final account. Appellants are the family of the deceased and a substitute trustee for his testamentary trusts. Respondents are the former personal representatives, trustees and counsel for the estate and trusts. Appellants argue that vacation is justified by respondents' fraud and/or by excusable neglect. We affirm.

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

## FACTS

Henry R. Weber died on March 13, 1980. Prior to his death, he was chairman of the board, president and principal shareholder of Mesaba Service and Supply Corporation. Mesaba bought and sold new and used heavy equipment for the mining, construction and quarrying industries. Robert O. Rosenberg, the long-time company secretary, was also a major Mesaba shareholder.

In 1966 Mesaba bought life insurance policies for key company employees including Weber. Weber's wife, Julia K. Weber, was not aware of the existence of this insurance policy. Originally the policy proceeds were to be divided equally between Mesaba and a deceased's estate. Weber was insured for approximately $400,000.

In February 1971 a shareholder agreement was instituted by Mesaba regarding the "right of first refusal" to the stock of deceased Mesaba shareholders. Rosenberg maintains this agreement replaced Mesaba's obligation to divide the insurance proceeds it would have received from the company's key person insurance policies. A July 1976 amendment to the "right of first refusal" agreement made it mandatory for Mesaba to purchase the company stock of a deceased shareholder.

On May 5, 1975, Weber's will was executed. Julia Weber, Rosenberg and the First National Bank of Minneapolis (First Bank) were named as personal representatives of the estate and trustees of the testamentary trusts. The will's beneficiaries were Julia Weber and two trusts: the Weber marital trust and the Weber family trust.

In 1977 Mesaba was counseled to formally terminate the key person insurance policies to avoid problems regarding the rights of retired key persons in those policies. According to Rosenberg, Weber did not so terminate because he believed the stockholder agreement of 1971 as modified in 1976 superseded any duties of Mesaba to divide the key man insurance proceeds.

During 1979 Weber and Rosenberg each sold half their Mesaba stock to the compa-

ny for $1,765,000 and $504,000, respectively. Mesaba was to pay off the outstanding balances on these purchases with monthly payments over a five year period.

Weber died the following year. After his death, no insurance proceeds were released to his estate. One week after Weber's death, Rosenberg told Julia Weber that forcing Mesaba both to purchase the second half of Weber's Mesaba stock, then worth $1,987,000, and to continue making payments on Mesaba's 1979 stock purchase, would bankrupt the company. Julia Weber agreed to a four year deferment of Mesaba's obligation to purchase the shares held by her husband at his death.

Lehan J. Ryan of Oppenheimer, Wolff, Foster, Shepard and Donnelly, having a long history of working with Mesaba and the Webers, was counsel to both the Weber trusts and the Weber estate. First Bank's duties as personal representative and trustee were carried out by trust officer James Diment. On or about April 29, 1980, letters testamentary were issued to the personal representatives. At approximately this time Julia Weber retained Raymond Reister of Dorsey & Whitney as personal counsel regarding probate matters. The record is somewhat imprecise regarding exactly when attorney Antrim was retained by the Webers' son James on this matter, but it was indisputably no later than January 1983.

Between Weber's death and the summer of 1981 Mesaba, under Rosenberg and others, made a series of investments which appellants assert were at least bad if not made in bad faith. These investments, according to appellants, resulted in requiring Mesaba to finance its operations through liquidating its assets.

In the spring of 1982, with a depressed domestic mining industry, Rosenberg sent a letter to all Mesaba shareholders except the Webers regarding possible liquidation of the company. Mesaba also agreed to redeem stock interests of several minority shareholders. Appellants claim this last action solidified the corporate officer's control over the company. During the fall of 1982, Mesaba suspended payments on several stock purchase agreements including the 1979 Rosenberg and Weber agreements.

In early 1983, administration of Weber's estate was substantially complete. By letter of February 16, 1983, First Bank sent a draft of the final account to Julia Weber for her approval. The probate court specifically found that Julia Weber and the other personal representatives signed the final account and a consent to the final account and issuance of final decree without further notice of hearing.

On March 4, 1983, Ryan sent the Weber children a copy of the final account. No objections were made to it until a suit was commenced August 14, 1986. Three days after Ryan's letter was sent, First Bank executed a petition for discharge of the estate's personal representatives.

On April 4, 1983, an order allowing the final account was issued. Appellants claim they first learned of its existence on August 6, 1986, during discovery. Also issued on April 4, 1983, were an order of complete settlement of the estate and a decree of distribution.

By letter of June 1, 1983, Ryan informed the court he would seek discharge of the estate's personal representatives when the appropriate taxes had been paid. Payment of estate taxes had been elected to take place over approximately five years. On July 1, 1983, the personal representatives signed the petition for their own discharge.

In an April 7, 1984, meeting with Reister, Rosenberg and First Bank, appellants vowed to take "appropriate legal action" if Mesaba defaulted on its obligation to purchase the second half of Weber's stock. Mesaba refused Julia Weber's tender of the stock. No legal action was taken, however. According to First Bank, no legal action was appropriate because a suit at that time would have bankrupted Mesaba and that would not have been in the best interests of any party. Therefore, such action was foregone.

Also, during June 1984 the Webers asked Ryan and Oppenheimer to resign. Ryan resigned June 21, 1984. The exact nature

of Ryan's resignation is contested: appellants allege the resignation completely disassociated Ryan and Oppenheimer from the Weber family interests. Respondents maintain Ryan resigned only as counsel to the trusts and claim Ryan received compliments from Julia Weber on his work for the estate.

On October 15, 1984, Rosenberg and First Bank resigned as trustees upon motion of the Weber family. Their resignations were accepted without discharge by Hennepin County district court.

On November 13, 1984, the Weber family trust sued First Bank, Rosenberg, Mesaba and others in Hennepin County district court under a variety of theories. Apparently, this suit has its genesis in Mesaba's allegedly fraudulent non-release of the insurance proceeds paid to it pursuant to the key person insurance policy taken out on Weber by the company.

On January 17, 1985, the Minnesota Department of Revenue filed a notice that all state estate taxes had been paid. In a deposition in April of 1985, the Webers and Antrim learned that orders regarding a final account and a final decree had issued but that the order discharging the personal representatives was yet to be issued.

On May 17, 1985, the Weber family trust moved to amend its complaint to add Ryan and Oppenheimer as party defendants. On June 21, 1985, Mesaba filed bankruptcy, removing the Hennepin County district court action to bankruptcy court and temporarily staying the motion to add Ryan and Oppenheimer as party defendants.

On June 26, 1985, after the stay of appellants' motion to add Ryan and Oppenheimer as party defendants, Ryan filed the petition for the personal representative's discharge without notice to appellants and without telling the court about the attempts to join him and Oppenheimer to the litigation. On July 10, 1985, after Ryan's submission of a federal estate tax closing letter, an order discharging the personal representatives of Weber's estate was issued. Appellants claim they did not learn about the discharge until March 6, 1986.

On January 17, 1986, the Weber estate and trusts initiated a separate federal district court action naming Ryan and Oppenheimer as defendants. On March 7, 1986, the bankruptcy court granted appellants' motion to amend their complaint and add Ryan and Oppenheimer as party defendants. One month later, that action was removed to federal district court.

In an action commenced on August 14, 1986, appellants requested vacation of the orders allowing the final account and the discharge of the personal representatives, and alleged fraud by respondents in seeking those orders and/or excusable neglect, inadvertence, or mistake. On August 28, 1986, a hearing was held on appellants' requests before the same judge upon whom the alleged fraud had been perpetrated.

On March 13, 1987, the two federal actions were consolidated.

On June 26, 1987, appellants' petition for vacation of the orders in question was denied and this appeal results.

### ISSUES

1. Did the probate court err in refusing to vacate its orders for fraud pursuant to Minn.Stat. §§ 525.02(c) or 548.14 (1986)?

2. Did the probate court abuse its discretion in not vacating its orders for excusable neglect, inadvertence, or mistake under Minn.Stat. § 525.02(d) (1986)?

3. Did the probate court apply an incorrect legal standard in examining appellants' claim under Minn.R.Civ.P. 60.02?

### ANALYSIS

Probate courts have the same power and authority to vacate their orders and judgments as the district courts, but no greater. *In re Estate of Woodworth,* 207 Minn. 563, 567, 292 N.W. 192, 194 (1940); *see also* Minn.Stat. § 525.02 (1986). A probate court's determination of a factual question is not to be set aside unless clearly erroneous. Minn.R.Civ.P. 52.01; *In Re Conservatorships of T.L.R.,* 375 N.W.2d 54, 58 (Minn.Ct.App.1985). Also, on appeal facts are viewed in a light most favorable to the prevailing party. *Theisen's, Inc. v. Red*

*Owl Stores, Inc.,* 309 Minn. 60, 243 N.W.2d 145 (1976). The probate court's order denying appellants' vacation request should not be reversed unless that denial was an abuse of discretion. *See Howard v. Frondell,* 387 N.W.2d 205, 207–08 (Minn.Ct.App. 1986), *pet. for rev. denied* (Minn. July 31, 1986).

### I.

Appellants allege that respondents fraudulently caused the probate court to issue the orders in question, and that this conduct justifies vacation under Minn.Stat. § 525.02(c). We disagree.

Minn.Stat. § 525.02(c) allows the probate court to:

> correct, modify, vacate or amend its record, orders and decrees: * * *
>
> (c) Within two years after petitioner's discovery thereof, for fraud, whether intrinsic or extrinsic, or misrepresentation unless petitioner be a party to such fraud; * * *
>
> In any case, petitioner must proceed with due diligence and may be barred by laches or the court may deny relief where it appears that the granting thereof would be inequitable in view of all the facts and circumstances appearing.

*Id.* After the August 28, 1986, hearing, the probate court found that the personal representatives, including Julia Weber, signed the final account and a consent to the final account and issuance of final decree without further notice or hearing. The probate court also found that "required notice of all probate proceedings was given to or waived by those entitled thereto." The second finding presupposes the waiver signed by Julia Weber was valid. We agree with this implicit finding.

The hearing required upon the complete and final settlement of an estate may be waived by written consent to the proposed account and decree of distribution or order of distribution by all heirs or distributees. Minn.Stat. § 524.3–1001(a)(3) (1986). *See also* Minn.Stat. § 524.1–402 (1986). The distributees of Weber's will were Julia Weber, First Bank, and Rosenberg. *See* Minn.Stat. § 524.1–201(10). It is undisputed that they each signed a consent to the final account and a waiver of further notice or hearing regarding issuance of the final decree. Upon submission of these documents to the probate court, the order allowing the final account of Weber's estate was issued.

We find appellants' arguments that respondents obtained this order through fraudulent nondisclosure of pertinent information unpersuasive. Letters were sent to Julia Weber regarding these documents by both First Bank and Ryan. These letters correctly explained both the nature of the documents and the effect their signing would have on estate administration. Also, when Julia Weber signed these documents in early 1983, she had personal, independent counsel specifically retained for probate matters. The record does not indicate there was any fraudulent nondisclosure of information to the court in the seeking of this order.

Appellants also allege that Ryan and Oppenheimer fraudulently caused the probate court to discharge the estate's personal representatives. Appellants maintain their first knowledge of the discharge came on March 6, 1986. After its hearing, the probate court found there was insufficient evidence to indicate fraud had been perpetrated in connection with the judicial proceedings relating to the Weber estate. Appellants argue that this finding is erroneous because of Ryan's fraudulent nondisclosure of information regarding the circumstances of the litigation surrounding the petition for discharge.

Ryan and Oppenheimer's alleged fraudulent nondisclosure in seeking discharge of the personal representatives has four elements: were they without authority to act for the Weber family interests after Ryan's resignation and did they fail to so inform the court?; did they seek discharge of the personal representatives without notice to appellants?; did they seek discharge of the personal representatives without disclosing to the court that First Bank, Rosenberg and others were being sued by the Weber family trust for breach of their fiduciary duties?; and did Ryan fail to inform the

probate court that the Weber family trust was attempting to join him and Oppenheimer in that suit as a party defendant?

■ Appellants' assertion that Ryan and Oppenheimer were without authority to act for the estate is unsupported by the record. The probate court made no findings that any of Ryan's postresignation actions were without proper authority. Neither Ryan nor anybody else proposed that the probate court consider substitute counsel for the Weber estate. These circumstances are consistent with Ryan's contention that his resignation pertained only to his position as counsel to the Weber trusts, and not as counsel for the Weber estate. We note, however, that Ryan's continuance as counsel to the estate after resigning as counsel to the trusts may have placed him in a somewhat awkward position.

■ Regarding respondents' alleged fraud for seeking discharge of the personal representatives without informing appellants, Julia Weber signed the petition for discharge of the personal representatives. Also, the probate court found that required notice of all probate proceedings had been given to or waived by those entitled thereto. Appellants challenge neither of these findings.

■ Appellants argue that Ryan's failure to disclose to the probate court that the personal representatives he sought to discharge were being sued by the Weber family trust and that attempts had been made to join him and Oppenheimer to that suit, constitutes fraud on the court. However, this information was ultimately disclosed to the very same judge from whom it was allegedly fraudulently withheld when the orders were issued. After the judge was given the information, he made a finding that there was insufficient evidence of fraud to allow the requested relief. Appellants' allegation on appeal that the probate court's finding is erroneous because the information in question was not disclosed when the suspect order was originally issued, begs the question of whether fraud was perpetrated. The probate court has addressed that argument and found that

appellants have failed in their burden of proof.

Appellants claim respondents' actions justify vacation of the orders for fraud pursuant to Minn.Stat. § 548.14 (1986). We must reject this approach also, for substantially the same reasons we deemed the relief of Minn.Stat. § 525.02(c) to be inappropriate. However, we do make one distinction. In pertinent part, Minn.Stat. § 548.14 states:

> Any judgment obtained in a court of record by means of perjury, subornation of perjury, or any fraudulent act, practice, or representation of the prevailing party, may be set aside in an action brought for that purpose by the aggrieved party in the same judicial district within three years after the discovery by him of such perjury or fraud. * * *

*Id.*

■ Ryan and Oppenheimer argue that relief under this statute requires initiation of a separate, independent equitable action. They cite *Carlson v. Carlson*, 371 N.W.2d 591, 594 (Minn.Ct.App.1985), *pet. for rev. denied* (Minn. Oct. 11, 1985). We do not read *Carlson* that broadly. A close reading of *Carlson* indicates the initiation of a separate action was required by petitioner's deficient pleadings. In *Carlson*, petitioner's sole reference to Minn.Stat. § 548.14 was in a memorandum accompanying her motion. We stated that such an ancillary reference "is not enough to bring this matter within the purview of section 548.14." *Carlson* at 594. Here, there is no such deficient pleading. Appellants specifically requested the relief of section 548.-14 in their amended petition. Thus, although we reject appellants' arguments under section 548.14, we do not base that rejection on their failure to commence a separate action.

## II.

Appellants urge that the order discharging the personal representatives should be vacated pursuant to Minn.Stat. § 525.02(d). That statute allows the probate court to vacate its orders:

Within two years after the date of filing of any record, order or decree, for excusable neglect, inadvertence or mistake.

Appellants argue that the order was issued because of the excusable neglect, inadvertence or mistake of either appellants and their counsel, or the court, or both.

■ Initially, appellants maintain the excusable neglect, inadvertence or mistake of themselves and their counsel stems from their belief that neither Ryan nor First Bank were employed by the estate after Hennepin County district court accepted the resignations of First Bank and Rosenberg in October 1984. Appellants argue they understood that all connections between the estate and trusts, and Ryan, Oppenheimer and First Bank were then severed. Additionally, appellants aver their assumptions regarding Ryan and Oppenheimer were appropriate because of Ryan and Oppenheimer's representation of Rosenberg and First Bank in appellants' suit against Rosenberg and First Bank.

We are unpersuaded by appellants' argument. Ryan was the attorney of record for the Weber estate when the petition for discharge was filed. This information was readily available and should have been known, at least by appellants' counsel, who at that time was pursuing an "extensive investigation" into the handling of the estate and trusts by Ryan and others. We also note First Bank explicitly contests appellants' assertions regarding the Ryan and Oppenheimer position in the litigation involving Rosenberg and First Bank.[1]

Appellants also argue that issuance of the discharge order without a hearing could have been the result of excusable neglect, inadvertence or mistake by the probate court, and rely on *In Re Henry's Estate*, 207 Minn. 609, 292 N.W. 249 (1940), to support their argument. We believe that appellants' reliance on *Henry's Estate* is misplaced. In that case a probate court order was vacated for mistake and inadvertence because a final account was procured without a proper hearing. However, in *Henry's Estate* there was no signed consent waiving the right to notice and a hearing. This distinction between the cases is crucial.

Finally, we note the two year time limitation set forth in Minn.Stat. § 525.02(d) precludes application of that section to the order allowing the final account. That order was filed in 1983.

### III.

Appellants claim the probate court failed to apply the proper legal standard for deciding a motion to vacate under Minn.R. Civ.P. 60.02(1). While all six subsections of Minn.R.Civ.P. 60.02 were cited in appellants' argument to the probate court, the crux of appellants' argument to that court was respondents' alleged fraud. Relief for fraud is granted pursuant to Minn.R.Civ.P. 60.02(3). Appellants may not now shift the emphasis of their argument from fraud under Minn.R.Civ.P. 60.02(3) to mistake or excusable neglect under Minn.R.Civ.P. 60.-02(1) and claim the probate court applied an incorrect standard in denying relief. To do so would be to allow the rule 60.02(1) argument to be made for the first time on appeal. As a reviewing court, we may not address an issue raised for the first time on appeal. *Thompson v. Barnes*, 294 Minn. 528, 536, 200 N.W.2d 921, 927 (1972).

Our review of any rule 60.02 issue raised by appellants must be limited to discussion of fraud under section (3) of that rule. The fraud issue has been fully addressed earlier in this opinion and resolved in favor of the probate court. Because the probate court's finding of insufficient evidence of fraud to require the relief appellants requested extends to Minn.R.Civ.P. 60.02(3), we affirm the trial court on this issue also.

---

1. To the extent appellants raise any issue on appeal regarding conflict of interest stemming from Ryan and Oppenheimer's alleged improper defense of First Bank and Rosenberg in the suit against them by the estate for which Ryan was counsel, we believe that issue to be resolved by the probate court's finding of insufficient evidence of fraud to require the relief appellants requested. Further, appellants' request for relief from this court pursuant to "Minnesota Statutes Section 544.32" is made for the first time on appeal. *See Thompson v. Barnes*, 294 Minn. 528, 536, 200 N.W.2d 921, 927 (1972). In addition, we note that statute was repealed in 1974.

As a final observation, there seems to be no dispute among the parties that the gravamen of this litigation appears to be an attempt by the parties to create or to defeat a res judicata argument on the issue of fraud and that the party prevailing here will present that argument in the pending federal litigation. In this connection, we note that the probate court's finding regarding fraud states only that there was insufficient evidence to indicate that fraud had occurred. Implicit in this finding by the judge upon whom that alleged fraud was allegedly perpetrated, is the recognition that appellants failed to sustain their burden of proof. We must, of course, ultimately leave to the federal court the determination of what weight to give to the res judicata arguments which both parties will almost certainly raise there.

## DECISION

Because appellants failed to show either that the probate court's findings of fact were clearly erroneous or its refusal to vacate the orders in question was an abuse of discretion, we affirm.

Affirmed.